# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | | |
|---|---|---|
| GREGORY NORMAN, | ) | |
| Petitioner, | ) ) ) | |
| v. | ) | No. 14-3089-CV-S-DGK |
| MICHAEL BOWERSOX, WARDEN, et al., | ) ) ) | |
| Respondents. | ) | |

## ORDER DENYING A WRIT OF HABEAS CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY

A jury in Missouri state court convicted Petitioner Gregory Norman ("Norman") of first-degree murder for killing his brother. Norman, now incarcerated, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1). Norman challenges his conviction on twelve grounds. For the following reasons, the Court DENIES a writ of habeas corpus and DENIES a certificate of appealability.

### Standard

A person in state custody may petition a federal district court for a writ of habeas corpus on the grounds that his continued detention violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2554(a). To be eligible for habeas relief, the petitioner must have exhausted his remedies in state court. *Id.* § 2254(b)(1)(A). Then, habeas relief is foreclosed unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d)(1), (2).

## Background

Because Norman does not argue that the state court's findings of fact were unreasonably determined, the Court defers to and adopts those factual conclusions. *See id.* § 2254(d)(2). Those facts, as recited by the Missouri Court of Appeals, Southern District, are as follows:

> Rick Norman and defendant were the oldest of five siblings. After their father died, defendant accused Rick of conspiring with their stepmother to steal the estate. Defendant eventually filed a will contest against his siblings and the stepmother. The siblings hired a lawyer, designated Rick as their contact person, and counterclaimed for a share of $103,000 "trust money" in defendant's possession. Rick filed an affidavit supporting the siblings' motion, in effect, to "freeze" the $103,000 while the case was pending. The motion was set for hearing December 19, 2001.
>
> Defendant was present for depositions on December 17, two days before the scheduled hearing. The siblings' lawyer offered to cancel the hearing if defendant would deliver the money to his lawyer or to the siblings' lawyer. Defendant said he would decide by noon the next day (December 18). Defendant then asked two of his siblings to get the hearing and their counterclaim stopped. One of them described defendant as frantic and panicky. Defendant, it was later determined, had virtually depleted the $103,000, perhaps to just $2,059.
>
> Late the following morning, the day before the scheduled hearing, Rick Norman was working at home. Mary, his wife, was at their nearby photography studio. She returned at noon to find the back door ajar, blood everywhere, and Rick's body down the hallway. He was shot in the chest, upper arm, lip, and head. Investigators eventually concluded that he was shot near the back door, but struggled to his feet and down the hall, leaning on the walls for support. After collapsing again in the foyer, he was fatally shot in the head. [Footnote: Alternatively, he was fatally shot, then collapsed.] Autopsy results and a shell casing under his body indicated Rick was killed by a .25 caliber shot from 18 inches or less, just above the right ear. Two men working nearby told police they heard what sounded like three small-caliber gunshots about 11:45 a.m. A tire-tread impression, not from Rick's or Mary's vehicle, was recovered near the rear driveway.
>
> Police went to defendant's home that evening. No one answered when they knocked and identified themselves, although the front door was slightly open, the lights were on, and three vehicles were parked there. Officers who went to the back could see persons inside. The officers at the front kept knocking and identified themselves even more loudly. They also called the residence several times and heard the phone ringing inside. Still no one responded. The officers in back reported they could see defendant inside with guns. The officers pulled back until they could get a search warrant. The search warrant arrived about 12:30 a.m., and defendant came out about 25 minutes later. The police took his shoes and socks and searched the home, finding 11 long guns, a .45

caliber pistol, various kinds of ammunition, and a video monitor hooked up to several cameras around the house and wired with an alarm. No .25 caliber weapon was found, but there was .25 caliber ammunition; an empty box of .25 caliber shell casings; and reloading equipment with .25 and .45 caliber die sets. There was trial evidence that defendant had owned a small handgun in addition to the .45 caliber pistol.

    A Cingular engineer, using phone records and cell-tower triangulation, placed defendant in the general vicinity near the time of the murder. Defendant told his sister he drove by Rick's home that day, but claimed he did not stop. Defendant's tire tread apparently was similar to the impression recovered near Rick's driveway.

    A swab of the steering wheel of defendant's vehicle was presumptive for blood, but too minimal for DNA analysis. Defendant's shoes bore blood splatter patterns, insufficient for DNA profiling, but consistent with the wearer standing next to a person shot in the head with a small caliber weapon while lying on the ground.

*State v. Norman*, 243 S.W.3d 466, 468–69 (Mo. Ct. App. 2007) ("*Norman II*").

Norman moved to suppress evidence seized in connection with the execution of the search warrant at his home. Although the circuit court granted the motion, the Missouri Court of Appeals reversed that decision. *State v. Norman*, 133 S.W.3d 151 (Mo. Ct. App. 2004).

The case proceeded to trial, where the jury found him guilty of first-degree murder and assessed punishment at life without parole. *Norman II*, 243 S.W.3d at 469. The Court of Appeals affirmed the conviction on direct appeal. *Id.* The Supreme Court of Missouri denied Norman's application for transfer. *State v. Norman*, No. SC89047, 2008 Mo. LEXIS 115 (Mo. Feb. 19, 2008).

Norman filed for post-conviction relief, which the Circuit Court denied and the Court of Appeals affirmed. (Doc. 9-25, *Norman v. State of Missouri*, No. SD31859 (Mo. Ct. App. Feb. 11, 2013) (per curiam unpublished)). He now files the instant petition for a writ of habeas corpus.

**Discussion**

**I. Norman is not eligible for habeas relief.**

Norman presents twelve grounds for habeas relief: (1) law enforcement had no probable cause to execute a search warrant on his home; (2) the evidence adduced at trial was insufficient to support a guilty verdict; (3) evidence that Norman kept firearms at his house should not have been admitted at trial; (4) evidence that officers saw Norman carrying firearms when they went to question him should not have been admitted at trial; (5) the prosecutor made an improper and prejudicial closing statement at trial; (6) the trial court should have changed venue because so many venirepersons had prior knowledge of the case; and (7–12) Norman's trial counsel was constitutionally ineffective for failing to present certain evidence and to object to certain evidence. Norman argues that the state court's adjudication of each of these issues "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

For the reasons explained below, none of these grounds entitles Norman to a writ of habeas corpus.

**A. The state court gave Norman a full and fair opportunity to litigate his Fourth Amendment claim.**

The trial court granted Norman's motion to suppress on the basis that the affidavit used to support a search warrant of his home failed to establish probable cause for the search. The Missouri Court of Appeals reversed that order. In Ground One, Norman claims the Court of Appeals improperly "ignored the trial court's findings and deferred, instead, to the issuing" of the warrant (Doc. 1, at 22). Alternatively, he argues the Court of Appeals lacked jurisdiction to reverse the circuit court because interlocutory appeals related to suppressing evidence in a first-

4
Case 6:14-cv-03089-DGK   Document 20   Filed 01/12/15   Page 4 of 18

degree murder case must be filed in the Supreme Court of Missouri, not the Court of Appeals. *See* Mo. Rev. Stat. § 547.200.3.

To succeed on this ground, Norman must show that the Court of Appeals's adjudication was contrary to a "clearly established Federal law[] as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Norman argues that the "totality of circumstances" did not support the issuance of a search warrant. However, the Supreme Court case of *Stone v. Powell*, 428 U.S. 465 (1976), provides the relevant inquiry here: "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 481–82.

Here, the state court gave Norman an opportunity to fully and fairly litigate his suppression claim. The issue was the sole focus of Norman's brief to the Court of Appeals on the State's interlocutory appeal, and the issue was the only issue addressed in the Court of Appeals's reasoned opinion. That court applied the relevant Fourth Amendment precedent. Although both the Circuit Court and the Court of Appeals called this a "very, very, very close" call, they gave Norman a full and fair chance to argue that call.

Norman argues that the Court of Appeals's determination is infirm because Mo. Rev. Stat. § 547.200.3 requires all interlocutory suppression appeals in first-degree murder cases like his to be filed exclusively in the Supreme Court of Missouri. Norman does not indicate how the Court of Appeals was somehow not equipped to fairly adjudicate this issue. Even if its review was procedurally improper in this instance, the Court of Appeals regularly entertains suppression

5

appeals in other types of criminal cases. Nor did Norman object at the time to the Court of Appeals hearing the issue.

The Court thus holds that the Court of Appeals's decision was not an unreasonable application of *Stone*'s mandate that Norman receive an opportunity to fully and fairly litigate his Fourth Amendment claim. The Court denies relief on Ground One.

## B. The state court properly found there was enough evidence to support Norman's conviction.

In Ground Two, Norman claims that there was insufficient evidence to support his conviction because the State's evidence was circumstantial.

The Supreme Court case at issue here is *Jackson v. Virginia*, which held that the Fourteenth Amendment requires the prosecution to adduce sufficient evidence to fairly support a conclusion that every element of the crime has been established beyond a reasonable doubt. 443 U.S. 307, 320–24 (1979). Under *Jackson*, a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact, viewing the facts in the light most favorable to the verdict, could have agreed with the jury. *Cavazos v. Smith*, 132 S. Ct. 2, 6 (2011) (per curiam). Therefore, if the state court unreasonably applied *Jackson* to conclude that the evidence was sufficient for Norman's conviction, then the Court may afford habeas relief.

The Missouri Court of Appeals denied this ground on direct appeal as follows:

> Defendant concedes there was evidence that he "could have been at Rick's house at the time Rick was killed," with the opportunity to kill him. Evidence also showed defendant did not aid his dying brother, but went home and hid from the police, thus implying his guilt.
>
> Motive can be important in a murder case based on circumstantial evidence, but it is not an element of the crime. *State v. Hodges*, 586 S.W.2d 420, 429 (Mo. Ct. App. 1979). Further, there was evidence from which the jury could have inferred motive. Defendant claimed Rick had conspired to deprive him of his inheritance. Defendant believed, as part of that conspiracy, that he was being followed and his phones were tapped. Defendant would not attend his father's funeral, in part, because Rick was there.

Defendant was litigating with Rick and his other siblings over money. Defendant had financial problems, including $27,700 in credit card debt, $27,000 owed on a mortgage loan, and numerous bad checks. Because of Rick's affidavit, defendant faced a hearing to disgorge $103,000 "trust money" that had dwindled to $2,059. Defendant was begging his other siblings to cancel that hearing, scheduled for the day following the murder. Defendant's claim that a money motive is "not persuasive" is more properly directed to a jury. The State did not have to prove motive; *a fortiori*, it did not have to prove an objectively logical motive.

What the State had to prove, directly or circumstantially, was that (1) defendant caused Rick's death; (2) he did so knowingly, *i.e.*, he knew his conduct was practically certain to cause Rick's death; and (3) he did so after deliberation, *i.e.*, cool reflection upon the matter for any length of time no matter how brief. *State v. Butler*, 951 S.W.2d 600, 604 (Mo. 1997); Mo. Rev. Stat. § 565.020.

The evidence of defendant's opportunity, motive, and consciousness of guilt recounted above is sufficient to support the first element. The close-range gunshot to Rick's head was practically certain to cause his death, establishing the second element. *Butler*, 951 S.W.2d at 605. Deliberation, the third element, may be inferred when a defendant had ample opportunity to terminate the crime, or the victim sustained multiple wounds. *State v. Buchli*, 152 S.W.3d 289, 298–99 (Mo. Ct. App. 2004). Rick initially was shot near the rear of the home. He apparently struggled through the house, trying to save himself, before he was finally killed in the foyer with a virtually point-blank shot above the ear. This reasonably indicates deliberation. *Id.* at 299.

The evidence, although circumstantial, sufficiently supports the conviction. *See, e.g.*, *Butler*, *supra; State v. Sherman*, 927 S.W.2d 350 (Mo. Ct. App. 1996); *State v. Moss,* 622 S.W.2d 292 (Mo. Ct. App. 1981).

*Norman II*, 243 S.W.3d at 469–70 (some citations altered).

The Court of Appeals thoroughly discussed the evidence and the elements of the crime. Applying the *Jackson* standard in all but name, the court demonstrated that there was sufficient evidence for a rational trier of fact to have reached a guilty verdict. *See Cavazos*, 132 S. Ct. at 6. Although Norman emphasizes the evidence against him was primarily circumstantial, the state court reviewing the sufficiency of the evidence must look at the evidence in the light most favorable to the prosecution. Using such a perspective, the state court believed that sufficient evidence allowed for inferences supporting each element of the crime of which Norman was convicted. Because this conclusion is well-grounded in the evidence admitted at trial, the Court

7

of Appeals did not contravene *Jackson* in finding there was sufficient evidence to find him guilty beyond a reasonable doubt. Norman's claim for habeas relief is denied on Ground Two.

### C. The state court did not err in admitting evidence related to Norman's firearms.

In Ground Three, Norman argues that the trial court abused its discretion in denying his motion for a mistrial after a police officer testified that he found guns while searching Norman's home. In Ground Four, Norman argues that the state courts should not have permitted officers to testify that they saw him possessing firearms when they initially went to the residence to talk to Norman. Norman argues that because these firearms were not linked to his brother's murder, they did not tend to prove any material fact and so were unfairly prejudicial. The Court of Appeals rejected these arguments under precedents of the Supreme Court of Missouri. *Norman II*, 243 S.W.3d at 470–71.

Norman does not identify any law clearly established by the Supreme Court that the Court of Appeals contravened. Generally, the Fourteenth Amendment does not preclude a state court from admitting evidence whose sole flaw is irrelevance. *See Spencer v. Texas*, 385 U.S. 554, 563–64 (1967) ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial. But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure." (internal citations omitted)). The Court can find no Supreme Court case standing for that proposition, and Norman's cases are inapposite. *See Old Chief v. United States*, 519 U.S. 172, 180–85 (1997) (holding a federal district court abused its discretion in admitting irrelevant evidence under Federal Rule of Evidence 403, a rule not at issue in Norman's state-court case); *Davis v. Alaska*, 415 U.S. 308, 319 (1974) (holding only that a state must allow a defendant the opportunity to impeach a witness for bias, and not "clearly establish[ing]" that a state violates due process by admitting irrelevant evidence).

Because the state court's adjudication did not implicate any Supreme Court precedent, the Court denies relief on Grounds Three and Four.

### D. The state court properly refused to declare a mistrial based on the prosecutor's closing argument.

Rick was killed with a .25 caliber gun, but investigators never recovered such a gun. A witness testified to seeing a small gun in Norman's possession a few years before, but could not recall the weapon's exact caliber. During closing argument, the prosecutor inaccurately stated that the witness had testified that Norman owned a .25 caliber firearm. Norman objected and moved for a mistrial. The trial judge denied the motion. The prosecutor continued with his argument and immediately corrected his mistake, this time accurately summarizing the witness's testimony. The court later instructed the jury that closing arguments are not evidence. In Ground Five, Norman argues that the improper closing argument violated his right to due process.

The "clearly established Federal law" relevant here comes from *Darden v. Wainwright*, which held that improper commentary by a prosecutor violates the Constitution only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." 477 U.S. 168, 181 (1986) (internal quotation marks omitted). The Court of Appeals held that the prosecutor's misstatement of the evidence did not render the trial unfair:

> Assuming the prosecutor briefly misstated the evidence, he immediately clarified and corrected his argument after defendant's objection. The jury was instructed that closing arguments are not evidence. We presume the jury followed those instructions. Based on the entire record, defendant has not proven that this single comment was decisive, or that the trial court clearly erred in denying his request for mistrial.

*Norman II*, 243 S.W.3d at 473 (internal citation omitted). Moreover, the prosecutor's single misstatement, quickly corrected, was much tamer than the multiple egregious comments at issue in *Darden* which did not constitute a due process violation.[1]

Therefore, the Court holds the Court of Appeals reasonably applied *Darden* in adjudicating this claim. Relief on Ground Five is denied.

### E. The state court fairly denied Norman's motion to change venue.

Before trial, Norman moved to change venue because the case had received considerable pretrial publicity. The trial court conducted voir dire on pretrial publicity. The twelve jurors and four alternates selected indicated that they may have heard something about the case, but had not formed any opinion about the case and could judge the case based solely on the evidence presented. The trial court then denied Norman's motion, finding that Norman had not shown the jury was unable to be fair and impartial. In Ground Six, Norman claims this was error.

The Supreme Court has held that "[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966). "Qualified jurors need not, however, be totally ignorant of the facts and issues involved." *Murphy v. Florida*, 421 U.S. 794, 799–800 (1975). To rise to the level of unconstitutional partiality, a juror must evince some hostility toward the defendant. *Id.* at 800.

The Court of Appeals rejected Norman's argument, stating,

> [T]he venirepersons exposed to pretrial publicity in this case were individually questioned, and twenty were struck for cause. Seven others, after individual questioning elicited no predisposed opinion or partiality, served among the twelve voting jurors. All seven had heard of the case sometime in the preceding four years. [Footnote: This case was tried more than four years after the crime.] Some knew [D]efendant was accused of murdering his brother. None could recall specific details of the incident. None had formed an opinion on

---

[1] In *Darden*, the prosecutor made several comments dehumanizing the defendant and expressing his disappointment that the defendant had not killed himself instead of the victim. 477 U.S. at 181 n.12. The Supreme Court found that these comments, however deplorable, did not render the trial fundamentally unfair. *Id.* at 183.

[Defendant's] guilt or innocence. Defendant challenged none of the seven for cause. The record fails to show that any of these jurors "had such fixed opinions that they could not impartially judge the defendant's guilt." *State v. Whalen*, 49 S.W.3d 181, 189 (Mo. 2001).

*Norman II*, 243 S.W.3d at 473–74.

The state court's reasoning is a sound application of *Murphy*. Nothing in the record indicates that any juror, including the alternates, had any negative, preconceived opinions of the case that they were unable to set aside. Nor does the record indicate the publicity surrounding the trial was so extensive that the trial court should have changed venue notwithstanding the venire's responses. Accordingly, the Court denies relief on Ground Six.

### F. The state court permissibly found Norman's trial attorney was not constitutionally ineffective.

In Grounds Seven, Eight, and Nine, Norman claims that his trial counsel was constitutionally ineffective. The Supreme Court has held that the Sixth Amendment guarantees the right to effective assistance of trial counsel. *Strickland v. Washington*, 466 U.S. 688 (1984). To establish that counsel's assistance was so ineffective that it deprived the petitioner of his Sixth Amendment rights, he must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *Id.* at 687.

An attorney's performance was deficient if it "fell below an objective standard of reasonableness." *Id.* at 688. In other words, counsel must have erred so seriously "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Under this prong, "[a]n informed decision made after thorough investigation of law and facts relevant to plausible options . . . is virtually unchallengeable." *Knowles v. Mirzayance*, 556 U.S. 111, 126 (2009) (internal quotation marks omitted).

In deciding whether counsel's deficient performance prejudiced the defense, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different" for an objective factfinder. *Id.* at 694–95. "A reasonable probability is a probability sufficient to undermine confidence in the outcome . . . [but i]t is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Harrington v. Richter*, 562 U.S. 86 (2011) (quoting *Strickland*, 466 U.S. at 693, 694) (internal citation and quotation marks omitted).

Given these standards, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because the standards embodied in *Strickland* and § 2254(d) are "highly deferential" individually and "doubly so" when applied in tandem. *Harrington*, 562 U.S. 86.

Relevant to Ground Seven, the police visited Norman's home early in their investigation. Although officers saw Norman inside, he did not answer the door. He now argues his trial counsel ("Trial Attorney") should have called a witness to explain that the reason he failed to answer the door was not because he was consciously guilty over his brother's murder, but because he was on the phone with a different lawyer who was telling him not to answer the phone ("Advising Attorney"). After that phone call, Norman retained Advising Attorney but discharged him before trial. A dispute over unpaid legal bills then arose between Norman and Advising Attorney.

The Missouri Court of Appeals thoroughly discussed this claim and denied it as follows:

> The motion court correctly found that counsel made a reasonable strategic decision not to present testimony about Norman receiving an attorney's advice because [Trial Attorney] believed that such evidence was unhelpful and could have harmed the case. The court credited [Trial Attorney]'s testimony that Norman and his previous counsel did not have a good relationship and that [Trial Attorney] did not want to risk those issues coming to light. [Trial Attorney] was familiar with such issues and even paid [Advising Attorney] to satisfy the "questionable demand" he was making of Norman. "Counsel

12

may and often does elect not to call a witness because he judges the witness's testimony will not be helpful and may be damaging." *State v. Hayes*, 785 S.W.2d 661, 663 (Mo. Ct. App. 1990); *Placke v. State*, 341 S.W.3d 812, 818 (Mo. Ct. App. 2011). Further, "[w]hen defense counsel believes a witness' testimony would not unequivocally support his client's position, it is a matter of trial strategy not to call him, and the failure to call such witness does not constitute ineffective assistance of counsel." *Winfield v. State*, 93 S.W.3d 732, 739 (Mo. 2002). Norman has failed to overcome the presumption that his trial counsel's decision not to present evidence concerning his previous attorney's advice was anything other than sound trial strategy. *See Placke*, 341 S.W.3d at 818; *Simmons v. State*, 247 S.W.3d 86, 91 (Mo. Ct. App. 2008).

> The motion court also correctly found that Norman failed to demonstrate prejudice. Norman's point relied on is predicated on the theory that Norman's actions when the police arrived at his house evidenced consciousness of guilt. At trial, however, the prosecutor did not present that argument to the jury. Although the facts of Norman's actions at his home while police were present were in evidence, the prosecutor did not even mention those actions in closing. There is nothing in the record to suggest that the jury's verdict was influenced by Norman's behavior after the murder as opposed to substantial evidence of: (1) motive; (2) opportunity; (3) Norman's cell phone usage that placed him near the scene of the murder; and (4) the .25 caliber ammunition and missing gun. *See Norman II*, 243 S.W.3d at 468–69. We find no clear error in the motion court's conclusions that: (1) trial counsel was not ineffective for failing to present evidence that Norman was acting on the advice of his attorney on the night of the murder; and (2) there is no reasonable probability that the admission of such evidence would have changed the outcome of the trial.

(Doc. 9-25, at 5–8) (some citations altered).

This Court finds these conclusions to be an objectively reasonable application of *Strickland*. Ground Seven is denied.

In Ground Eight, Norman argues that his counsel should have objected to testimony from a forensic scientist, Linda Netzel ("Netzel"), regarding blood spatter found on Norman's shoes. Netzel would not conclusively state that the blood belonged to a male like Norman and the victim, or even that the blood came from a human.

The Missouri Court of Appeals rejected this claim. It first noted that while Trial Attorney "initially sought to object to the evidence, he changed his mind because he found Netzel's

testimony to be 'quite conducive to the evidence [he] wanted to use.'" (Doc. 9-25, at 13). It continued:

> [Trial Attorney]'s trial strategy was to show that the substance found on the shoes was not really human blood. [Trial Attorney] testified that, if the State had wanted to argue that the stains were "evidence of something . . . it played right into our hands" because "it wasn't evidence that Mr. Norman was standing next to somebody when they were allegedly shot."
> In denying the claim, the motion court stated that it was clear that trial counsel made a strategic choice, and that the chosen strategy was reasonable in light of the facts of the case, the selected defense, and rulings obtained pretrial and during trial. The motion court also found that Norman failed to prove that the outcome of the trial would have been different but for counsel's actions.
> Norman contends the motion court's findings are clearly erroneous. Norman argues that "Netzel's testimony was irrelevant and more prejudicial than probative because her blood testing was 'negative' for human blood, and her DNA testing on the shoes only revealed a female profile, whereas the victim was a male. [Norman] was prejudiced because the State and this Court used Netzel's testimony to argue that there was evidence that the blood spatter was consistent with the wearer of the shoes standing next to the victim when he was shot, even though this would only be true if the blood spatter was human, and male, which Netzel's testimony about the shoes failed to establish making it legally irrelevant." Again, we are not persuaded by these arguments.
> Ineffective assistance of counsel is rarely found in cases of trial counsel's failure to object. *Worthington v. State*, 166 S.W.3d 566, 581 (Mo. 2005). Such a failure will only be deemed ineffective when the defendant has suffered a substantial deprivation of his right to a fair trial. *Id.* In addition, trial counsel is not ineffective for failing to make non-meritorious objections. *Id.* To the extent Norman is arguing trial counsel was ineffective for failing to object to admissibility of the blood spatter evidence because the results were not conclusive, that argument fails. "Scientific tests do not have to be conclusive to be admissible." *State v. Taylor*, 298 S.W.3d 482, 500 (Mo. 2009). As long as the testing that was conducted is accurately described so that the jury is fully informed as to what the tests do and do not establish, the lack of conclusive findings goes to the weight of the evidence, not its admissibility. *Id.*; *State v. Ferguson*, 20 S.W.3d 485, 495 (Mo. 2000). Netzel provided ample testimony explaining the testing procedure and the results. "[C]ounsel cannot be deemed ineffective for failing to object to admissible evidence." *White v. State*, 939 S.W.2d 887, 898 (Mo. 1997). We agree with the motion court that trial counsel's decision not to make any further objections to the blood spatter evidence was reasonable trial strategy because the results were actually helpful to the defense. After listening to Netzel's testimony, no reasonable juror would have found that such evidence supported an inference that Victim's blood was on Norman's shoes. Thus,

Netzel's testimony was not prejudicial to Norman. "Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance." *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. 2006). We find no clear error in the motion court's conclusions that: (1) trial counsel was not ineffective for failing to object to the blood spatter evidence; and (2) there is no reasonable probability that the admission of this evidence changed the outcome of the trial.

(Doc. 9-25, at 13–15) (some citations altered).

This Court finds this analysis is not an unreasonable application of *Strickland*. Ground Eight is denied.

In Ground Nine, Norman asserts his counsel should have objected to Netzel's testimony that a swab from the steering wheel of Norman's truck tested positive for blood. Netzel obtained these results after performing a Hemastix test, which is "a precursor test to indicate possible presence of blood." (Doc. 9-25, at 17 n.3). In denying this claim, the Court of Appeals stated:

> During the evidentiary hearing, [Trial Attorney] testified that he understood the Hemastix test was merely a presumptive test for blood. Such evidence could have been relevant if it actually was blood that belonged to someone other than Norman. [Trial Attorney] initially tried to suppress the steering wheel swabs as being outside of the scope of the search warrant. When that effort proved unsuccessful, his trial strategy was to treat that evidence like all of the other potential blood evidence, which was to show that it all involved speculation and conjecture. Because of the manner in which the evidence was presented, he did not believe it was particularly incriminating. [Trial Attorney] testified that an objection about the presumptive nature of the test likely would have been overruled as going to the weight, rather than the admissibility, of the test. [Trial Attorney] also testified that he was able to address this evidence using the same argument as he did with the shoe tests. Because the test was merely presumptive for blood, [Trial Attorney] did not request a *Frye* hearing. [*See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).] He would have requested one if the State had sought to use the test as a definitive test for blood. [Trial Attorney] also said his choice of words during Netzel's cross-examination did not concede that the substance on the steering wheel was blood.
> In denying the claim, the motion court stated that it was clear that counsel made a strategic choice and that the chosen strategy was reasonable in light of the facts of the case, the selected defense and rulings obtained pre-trial and during trial. The motion court also found that Norman did not prove that a *Frye* hearing was necessary regarding the Hemastix test or that counsel's failure to ask for a *Frye* hearing changed the outcome of the trial.
> Norman contends these findings are clearly erroneous. Norman argues that "Netzel's testimony about the presumptive test was irrelevant, more prejudicial than probative, and

failed to meet the *Frye* standard for admissibility of scientific test results, because she only performed a presumptive Hemastix test for blood without performing any other secondary testing to confirm a presumption of blood or any confirmatory test, which prejudiced [Norman] in light of [Trial Attorney]'s examination of Netzel suggesting that the Hemastix test showed that the substance on the steering wheel was blood." We disagree with these arguments.

> An objection in this case that the Hemastix evidence was inadmissible because it did not meet the *Frye* standard would have lacked merit. Scientific tests do not have to be conclusive to be admissible, as our Supreme Court explained in *State v. Taylor*, 298 S.W.3d 482, 500 (Mo. 2009). As long as the testing that was conducted is accurately described so that the jury is fully informed as to what the tests do and do not establish, the lack of conclusive findings goes to the weight of the evidence, not its admissibility. *Id*. Like the case at bar, *Taylor* involved testimony about the positive results of a presumptive test for blood where the sample size was too small for a confirmatory test. *Id*. at 499. Our Supreme Court found that the evidence was admissible because the jury was informed that the test was presumptive, indicating only the possible presence of blood, and that no confirmatory test had been performed because of the size of the sample. *Id.* at 501. Likewise, the jury in this case was told only that the Hemastix test resulted in a positive presumptive reaction and that the sample was too small for testing. An objection during trial to that testimony would have lacked merit, and counsel is not ineffective for failing to make a non-meritorious objection. *Worthington v. State*, 166 S.W.3d 566, 581 (Mo. 2005). . . . Lastly, there was no misstatement in [Trial Attorney]'s choice of words during Netzel's cross-examination. His question to Netzel that she could not tell whether the substance "was male, female, *human or whatever*; is that correct?" adequately apprised the jurors to view the specimen with skepticism, and potentially infer that it was not human blood or even blood at all. The admission of this evidence was highly unlikely to have changed the jury's verdict. We find no clear error in the motion court's conclusions that: (1) trial counsel was not ineffective for failing to object to the Hemastix test; and (2) there is no reasonable probability that the admission of this evidence changed the outcome of the trial.

(Doc. 9-25, at 17–19) (internal citation omitted).

The Court finds that this adjudication is not an unreasonable application of *Strickland*.

The Court denies habeas relief on Ground Nine.

### G. Norman has procedurally defaulted his remaining claims of ineffective assistance of counsel.

Finally, Norman brings three additional claims that his counsel was ineffective. In Ground Ten, he argues his counsel should have presented an alibi defense. In Ground Eleven, he argues his counsel should have presented evidence about the tire tracks outside the victim's

house.  In Ground Twelve, he contends his counsel should have called his wife to testify.  The Court will not entertain these claims, because they are procedurally defaulted.

A federal court may not grant a writ of habeas corpus unless the petitioner has first exhausted his state remedies.  28 U.S.C. § 2254(b)(1)(A).  A petitioner properly exhausts his state remedies when he has "fairly present[ed] . . . the substance of his federal claims in each appropriate state court."  *Turnage v. Fabian*, 606 F.3d 933, 936 (8th Cir. 2010) (internal citations omitted).  A petitioner can circumvent this bar by demonstrating his initial post-conviction counsel was constitutionally ineffective under the standards of *Strickland*.  *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012).  This exception "does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings."  *Id.* at 1320.

Norman did not raise the substance of Grounds Ten, Eleven, or Twelve in any form before the state post-conviction appellate court.  His claim, thus, is defaulted.  Norman argues he is excused from the default because of ineffective assistance of counsel at the post-conviction *appellate* level, where his counsel did not appeal the grounds raised at the initial-review post-conviction proceeding.  However, ineffective assistance of counsel excuses habeas procedural default only for the *initial* post-conviction proceeding, not an appellate post-conviction proceeding.  *See id.* at 1320.  Thus, any ineffective assistance by that attorney does not excuse Norman's default.  Nor does Norman argue that he meets any exceptions to the procedural default bar.  *Cf. Turnage*, 606 F.3d at 941.

Even if the Court could excuse the bar and evaluate the ineffectiveness of Norman's post-conviction appellate counsel, relief would not be appropriate.  Ineffectiveness is measured by *Strickland*, meaning the petitioner must show deficiency and prejudice.  *Martinez*, 132 S. Ct. at

1318. Norman has not made any showing that his counsel was either deficient or prejudicial. Accordingly, Grounds Ten, Eleven, and Twelve are procedurally defaulted and denied.

In sum, the Court denies relief on all twelve grounds presented by Norman.

**II. No certificate of appealability shall issue.**

Because the Court will enter a final order adverse to Norman, it must grant or deny a certificate of appealability. *See* Rules Governing Section 2254 Proceedings, Rule 11(a). A court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claims "debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 276 (2004). Because no reasonable jurist would grant this motion, the Court denies a certificate of appealability. *See* 28 U.S.C. § 2254.

**Conclusion**

Accordingly, the petition for a writ of habeas corpus (Doc. 1) is DENIED and the issuance of a certificate of appealability is DENIED. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Date:  January 12, 2015              /s/ Greg Kays
                                                                               GREG KAYS, CHIEF JUDGE
                                                                               UNITED STATES DISTRICT COURT